Barrett, J. (Dissenting).
The views entertained by the learned judge at special term have since been substantially overruled in Kennedy v. Thorp (3 Abb. Pr. N. S., 131), Judge Brady himself delivering the opinion of the court. The fact, so abundantly established in the case at bar, that the assignors had, by false representations of solvency, purchased large quantities of goods shortly prior to the making of the assignment, was there held to warrant the conclusion that the assignment itself, though valid upon its face, and apparently regular, formed but a part of the general scheme to defraud the sellers. That case, too, presented certain explanatory features which are absent here, while its collateral circumstances were slight, when compared with the numerous and bald indicia of a continuous design, disclosed in these motion papers.
Were the question an open one in this court, I should, perhaps, venture to express an opinion in favor of narrowing the doctrine of Kennedy v. Thorp to cases where the insolvent’s recent purchases, effected by means of false statements, are connected with some direct evidence, however slight, of fraud in the act of assigning, or where they are coupled with other facts and circumstances pointing convincingly to the instrument itself, as the fraudulently concocted culmination of a continuous scheme. But if so confined, all the required elements are found in the case at bar, and even the few facts referred to by the learned first judge, each undoubtedly insufficient of itself, and as a separate piece of evidence, present, when grouped together, and considered with reference to them mutual dependence, an almost irresistible array. Not only were the goods obtained by fraud-' ulent representations as to capital and solvency, but as to the very composition of the firm. A. R. Miller, who now swears that he had no connection whatever with R. *182 H. Miller & Co., was repeatedly declared to be a member of the firm, and to have put in $15,000, and he was actually held out as such upon the bill-heads and upon the printed captions of the letters sent to the plaintiff. Even after the execution of the assignment this branch of the fraud was not frankly admitted, but the truth was evaded by the pretense that he had drawn out the greater part of his capital. Further falsehood and duplicity were resorted to in order to conceal the making of the assignment, and.to lull the plaintiff’s fears until it had been fully consummated. It was executed early on January 8, 1867, and was recorded before twelve o’ clock, noon. On that very morning the plaintiff called upon R. H. Miller, and inquired whether the notes due on the following day would be paid, to which Miller replied, “Yes, he thought so,” but requested Place to call at twelve o’clock of that day. Returning as requested, Place was at once introduced by Miller to the assignee, and upon his expressing great surprise, and inquiring what had become of the $45,000 of cash capital, Miller replied that his brother, the same who now swears that he was not a member of the firm at all, had drawn out his capital, or the greater part of it, and that Steel, who had promised to put in $15,000, but had not done so, was then traveling in the west, and that he, Miller, had not ■ seen or heard from him in the last six weeks. This latter statement was also untrue, for this was on January 0,- and Steel ratified the assignment in New York on the tenth, and it appears by Steel’s own recital, as well as that of Miller and the assignee, that he had been “ heard from” so far as to express his consent prior to the execution of the assignment. Miller’s conscience, too, seems to have been awake to the fallibility of the instrument, which he must have assumed in begging Place not to “ break itand, in this connection, he deliberately stated that he had made it to “keep off his Jew creditors ’ ’ whose debts were about to mature, and that if he, Place, would 11 keep still, he would get his pay.” All this is corroborated by Flanders, who says that at this *183 point the more cautious assignee came in and called Miller aside, the result of which was that in a few minutes the latter rejoined Place and Flanders, and expressed his regret at having conversed with them at all, naively adding that he “had not said anything.”
These declarations, although made after the execution of the assignment, and perhaps not admissible as against the assignee, were clearly evidence as against the assignors. The assignee is neither party nor privy to this action, and his title is not affected by the sustaining or vacating of the present attachment. His right to the property claimed to have passed under the assignment is a matter to be determined quite independently of the result of this suit or proceeding. Any declarations made by the defendants herein at any time are, therefore, evidence against them of a fraudulent intent in the assignment or other disposition of their property. The declarations being admitted, I cannot think they come within the principle or reasoning of those cases referred to by the learned judge at special term, where it was held that a fraudulent intent can never be inferred from merely threatening to do a lawful act. On the contrary, the admission here was that an act lawful in itself had been effected for the unlawful purpose of hindering and delaying a certain class of creditors, and that it had been managed in such a manner that if Place would only “keep still, and not break it up, he would get every dollar of his money.” Again, the assignment itself was strongly preferential, and, although a debtor has a perfect legal right to prefer, yet this fact cannot be entirely overlooked when we consider the unexplained evidence of fraud in the dealings of the firm, the surroundings of the instrument itself, and all the other facts and circumstances which point to it with so much suspicion.
Another bad feature of the case was the giving up of a large quantity of goods to effect a discharge of the Stilwell warrant issued against Miller by a justice of the superior court. These goods, it is claimed, were merely consigned by Place to Miller & Co., and, therefore, did *184 not pass under the assignment. This is denied by Place and Chapman, and no letters in support of the statement or bills of consignment, or such other documentary evidence as would naturally be in Miller’s possession, are produced or referred to. Besides, if given up as being Race’s property, it is not likely that the assignee would have billed them to him as upon a sale, nor that, as a consideration therefor, over §5,000 of the firm’s indebtedness would have been canceled. The farther explanation that it was done after consultation with ‘1 the creditors,” is equally unsatisfactory. Such consultation was unnecessary upon the previous theory. Place says, however, and it is not denied, that the proposition'was made in court immediately upon the return of the warrant. When, then, the consultation took place, and whether and 1 ow the assignee, in such a brief interval, was enabled to confer with every one of the numerous creditors of the firm, resident and non-resident, is not stated. This certainly was essential to validate so serious an act as that of practically preferring Place for a large part of his debt, and that, too, over even those preferred in the assignment, and in derogation of its provisions. Something more specific was required in that connection than the mere general statement that “ he had consulted with the creditors of the firm,” who approved or assented ; and I cannot but look upon that transaction as indicating an understanding between the assignors and the assignee, and an ability upon the part of the former, with the latter’ s consent, to manipulate the firm property according to the exigencies of their position, and with very little regard for the provisions of their formal trust.
I find nothing frank or honest in the course of the defendants, either prior to or at the time of the making of the assignment, or subsequently; and, in my judgment, the order vacating the attachment should be reversed, and the attachment reinstated.
Brady, J.
I deem it necessary to say that the case of Kennedy y. Thorp, referred to by Judge Barrett, is *185 'entirely different from, this case. The facts disclosed there established the design to accumulate property immediately prior to the assignment, and by fraudulent representations. Such is not the case here.
Order affirmed.